EMILY THOMPSON et al.

*v.*

JOHN WEST et al.

[Filed April 23d, 1898.]

1. The administrator of C., a deceased daughter of the deceased mortgagee, and a daughter of C., to whom the administrator had assigned a half interest in the mortgage, filed a bill against the mortgagor individually and as administrator of R., the other deceased daughter of the deceased mortgagee, to foreclose. The money was admitted to be due, and the only disputed question was as to its distribution.—*Held*, that complainant, daughter of C., was not competent to testify to statements by R. during her life, contracting to bequeath her share in the mortgage to C.

2. An agreement between two sisters who jointly owned a mortgage, that, in consideration of the one boarding the other, the property of the latter should "revert" to the former on her death, does not show a completed assignment thereof.

3. Upon the facts established in this case—*Held*, that the evidence was not sufficiently convincing to show a gift of the mortgage.

On final hearing.

*Mr. Edmund Wilson*, for the complainants.

*Mr. James Steen* and *Mr. Robert Allen, Jr.*, for the defendants.

Thompson v. West.

Stevens, V. C.

This is a bill to foreclose a mortgage given by John West to Mary West. Mary West died intestate in March, 1886. Her property consisted of a house and lot in Middletown, and of the mortgage of $3,300, which is being foreclosed in this suit. No letters of administration upon her estate were issued until June, 1894. Her daughters, Caroline and Rebecca, were her only heirs-at-law and next of kin. Although no letters of administration were taken out, John West, the mortgagor, paid the daughters interest on the mortgage until the death of Rebecca, in July, 1889. Then he paid it to Caroline until she died, in October, 1893. Rebecca, like her mother, died intestate. Her sole heir-at-law was her sister Caroline. Her next of kin were this sister, a half-brother, John West, and a half-sister, Martha Ann Jones. When John West paid the entire interest money to his half-sister, Caroline, he did it in ignorance of the legal rights of himself and his sister. Caroline, by her will, left her property to her children, Emily Thompson, Richard Lufburrow and Caroline Applegate. The executors of her will, finding that no legal disposition could be made of the Mary West mortgage until an administrator was appointed, procured administration to be taken out by one of them, Richard Lufburrow, who, as administrator of Mary West, assigned the mortgage to himself and William M. Thompson, as executors of Caroline. They assigned a half interest in it to the complainant Emily Thompson. The other half interest they hold in trust for Mrs. Applegate. The legal title to the mortgage stands, therefore, one-half in Emily and one-half in the executors of Caroline. In 1896, John West, being advised that he and the children of Mrs. Jones, who died in 1893, had an interest in the mortgages as two of the next of kin of Rebecca, took out administration on her estate, and now claims that although the legal title is as I have stated, yet that, as administrator of Rebecca, he is entitled to her share of the mortgage money, viz., one-half. It is, on the other hand, claimed by the executors of Caroline that she, in her lifetime, acquired by contract or gift from Rebecca, Rebecca's interest, and that, therefore, they became, in equity as

well as at law, the sole owners of the mortgage in question. This is the only matter in dispute.

The complainants, in their evidence, took two alternative and somewhat inconsistent positions. They sought, in the first place, to prove by Emily Thompson that there was a contract between Rebecca and Caroline, by the terms of which Caroline was to have Rebecca's share of the mortgage at Rebecca's death ; and they sought, in the second place, to prove by Amanda Lufburrow, wife of Richard Lufburrow, that Rebecca gave her share to her sister in her lifetime.

It appears that immediately after the death of their mother, in 1886, the two daughters moved into the house or hotel, the title to which had just descended upon them, and that they talked over the " financial situation." Mrs. Thompson's evidence is as follows :

"Aunt Rebecca said she hadn't any money to pay board unless she took her principal, and she didn't want to use it in that way, and if mamma would let her remain there with the understanding that after she had finished her life the mortgage, or the interest which she held in it, and what other property she possessed, would *revert* to mamma, and mamma was satisfied."

The first question which arises is whether Emily Thompson was competent to give this evidence. In determining this it will be necessary to consider the objects of the suit and the position of the parties to it. Its primary object is to foreclose a mortgage. Its secondary, to distribute the mortgage money among those entitled to it. Had Richard Lufburrow, before he assigned, brought this suit as administrator of Mary West, the duty of directing the distribution of the mortgage money would not have been imposed upon this court. The suit would have been one instituted by the administrator of the mortgagee against the mortgagor, and they would have been the only parties. But the transfer of the mortgage by Richard to himself and Thompson, in their character of representatives of Caroline, and the transfer by these latter to Emily Thompson of a half interest therein, have introduced an element of complexity into it. John West now appears in it not only as mortgagor, but as

administrator of Rebecca, claiming, as such administrator, that the assignment of the legal title by Richard was wrongful. The mortgage money is admitted to be due, and the dispute is only as to the persons among whom it is distributable. This controversy is presented by cross-bill. Looking, therefore, at the substance of the issue, it appears that the parties whose interests are really antagonistic are, on the one hand, Emily Thompson and the executors of the estate of Caroline, and on the other, the administrator of Rebecca. The testimony shows that Caroline's estate has been distributed on the assumption that she owned the entire mortgage in her lifetime and that Emily Thompson can only retain the entire half interest assigned to her in case it is established that Rebecca's administrator has no title to any part of the mortgage money. That the court can look at the substance of the issue through the mere form of the procedure was decided by the court of appeals in *Smith* v. *Burnet, 8 Stew. Eq. 321.* That the record alone furnishes the statutory criterion of the competency of the litigants was decided by *Hodge* v. *Coriell, 15 Vr. 456, 17 Vr. 354.* Looking at the substance of the issue, as disclosed by the record, we find that Emily Thompson stands therein as a party who, in her own right, prosecutes a claim against John West as administrator of Rebecca. As such party her interest is as directly antagonistic to that of Rebecca's administrator as is the interest which the executors claim to hold for the benefit of Mrs. Applegate. It would seem, therefore, that the case falls within the principle of *McCartin* v. *McCartin, 18 Stew. Eq. 265,* where the effect of a representative on one side only was considered, and not within the principle of *Haines* v. *Watts, 26 Vr. 149,* where the effect of representatives on both sides was considered. It is true that we have here, as in *Haines* v. *Watts,* the case of persons standing in a representative capacity on opposite sides, but then, it is to be observed, Emily Thompson is not one of those representatives. She is a party with an interest of her own, which she is setting up in antagonism to Rebecca's administrator. The substantial controversy, so far as she is concerned, is between a representative on the one side and a person claiming in her own right on the other. When she

offers herself against that representative she must stand or fall on the strength of her own position and not on the representative character of some one else claiming a distinct right. I think, therefore, the evidence of Emily Thompson should not be read.

But even if her evidence were competent, it would not of itself warrant the inference that Rebecca had assigned to Caroline. The agreement was, in terms, that Rebecca's interest should *revert* to Caroline at her death. If this were the expression really used by Rebecca at that time, it would seem to be an agreement that she would not make a will, so that Caroline, as she erroneously supposed, might take all her interest under the statute of distributions. At best, giving to the word "revert" a non-natural meaning, the agreement in question could not be more than an undertaking to make a will in Caroline's favor. No will was made, and consequently we have here not the case of an agreement fulfilled, but of one broken, the breach giving rise merely to an action of damages.

The position secondly taken by the complainants was that Rebecca made a gift of her interest to Caroline in her lifetime. Amanda, wife of Richard Lufburrow, testified that Rebecca died of consumption; that she was ill, during the last two years of her life, most of the time, and that in December, 1888, about seven months before her death, she desired Caroline to go up to her room because she wanted to give her some papers.

"She said, when she went into her room, after we were there a little while, she said 'Now, Lina, I will settle about these papers,' and she took a bunch of keys and went to the bureau drawer and unlocked it and she took out this package of papers and she handed it to Mrs. Caroline Lufburrow, and Mrs. Lufburrow said 'Becca, what do you want me to do with them?' she said 'What for.' She said, because they are yours. I give them to you. Everything I have got is yours, and she gave her this package of papers."

She subsequently said that she saw the mortgage in the package. On cross-examination she was asked: "Did she say, I will give you these papers, or I will give you my interest in them?" And her reply was: "She said I will give you these papers."

Does this testimony prove that Rebecca gave her equitable interest in the mortgage to Caroline? I think it does not. In the first place, it must be remembered that the equitable title to this mortgage was vested equally in Rebecca and Caroline. The one was as much entitled to the manual possession of it as the other. The transfer of this possession from the one to the other, therefore, loses much of its significance. When we consider that Rebecca must have been at that time in an advanced stage of consumption, the mere act of transfer is, if possible, still less significant. Certainly it was not unnatural that one who felt herself gradually sinking should give the papers in which she and her sister were jointly interested to that sister. We must then have recourse to the words accompanying the transfer. Here we must bear in mind that the witness was testifying to a conversation which took place about nine years previously. It is not to be supposed that she could recall the precise words used. The words " I give them to you " are open to the same criticism that was applied to similar words in the case of *Smith* v. *Burnet, supra*. Mr. Justice Reed said, in delivering the judgment of the court of appeals in that case : " The word ' give ' is often used with other meaning than as evincing an intention to confer the title in the thing delivered. You give a person an article to carry for you or to perform work upon. * * * This view, together with the difficulty of recalling or stating with accuracy all that was said, and how it was said, should cause such a declaration to be closely scrutinized before a title is passed solely upon testimony like that here adduced." These remarks are peculiarly applicable to this case. The further statements, if accurately remembered, " because they are yours; everything I have got is yours," which, as to Rebecca's interest in the real estate, were manifestly inaccurate, point as probably to that close community of interests by which they were bound together— interests which, as she believed, would soon be converted by her death into an absolute ownership on her sister's part—as they do to a then present intention to make a gift *inter vivos*. It is true that bonds and other non-negotiable obligations for the payment of money are held to be the subject of a valid gift, and

that the delivery of the obligation to the donee without written assignment, but with a clearly-manifested intention to give, is sufficient. *Travelers' Insurance Co.* v. *Grant, 9 Dick. Ch. Rep. 212;* *Corle* v. *Monkhouse, 5 Dick. Ch. Rep. 537.* But it is to be remembered that under the operation of the statute of frauds, no sale of such an interest could be effected by parol merely. *Greenwod* v. *Law, 26 Vr. 168.* If public policy, evidenced by this statute, requires that transfers of such interests, when founded on consideration, be in writing, certainly, in the case of transfers of similar interests, to take effect by way of gift, a like policy should require that the parol evidence of transfer be convincing. This is far from being the case here. Besides, the subsequent conduct of the parties is at variance with the hypothesis that an absolute gift was then intended. No notice of the alleged assignment was given to the mortgagee who subsequently paid $300 of the principal, and a year's interest to both the sisters. The principal so paid was used in defraying the cost of a monument to their mother. Rebecca's share of the interest was treated by her as her own, and she gave a part of it to her half-sister, Mrs. Jones. I think the complainants have failed to establish either an assignment for consideration or a gift.